# United States Court of Appeals
## For the First Circuit

No. 25-1598

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

Plaintiff, Appellant,

v.

HARVARD GRADUATE STUDENTS UNION - UNITED AUTOWORKERS, LOCAL 5118,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Gelpí, Thompson, and Dunlap,
Circuit Judges.

Robert A. Fisher, with whom John Ayers-Mann and Seyfarth Shaw LLP were on brief, for appellant.

Patrick N. Bryant, with whom Pyle Rome Ehrenberg PC was on brief, for appellee.

September 14, 2026

**THOMPSON, Circuit Judge.** Since the mid-eighteenth century, unions have been instrumental in protecting workers' rights, promoting fair wages, and advocating for safer working conditions. Indeed, unions were born out of a need to protect the common interest of workers, a goal enshrined in a multitude of federal and state labor laws. As of 2024, more than 14 million workers across the United States -- almost 10% of the country's workforce -- belong to a union.[1] Among them are the graduate student workers of the Harvard Graduate Students Union -- United Autoworkers, Local 5118 ("Union"), which brings this case against the President and Fellows of Harvard College ("Harvard").[2] After the United States District Court for the District of Massachusetts upheld an arbitration award for the Union, Harvard asks us to vacate it. Finding no error in the district court's decision to uphold the arbitrator's judgment or in the arbitrator's construction of the collective bargaining agreement, we affirm.

## I. Background

"We rehearse the facts as supportably found by the arbitrator." Zayas v. Bacardi Corp., 524 F.3d 65, 66 (1st Cir.

---

[1] Economic News Release: Union Members Summary, U.S. Bureau Lab. Stat. (Feb. 18, 2026), https://perma.cc/SQ77-QMHB.

[2] According to its official website, Harvard University is a co-educational, private research institution of higher education located in Cambridge, Massachusetts and Harvard College is one of the fourteen schools that are a part of the University.

2008); see also Bos. Med. Ctr. v. Serv. Emps. Int'l Union, Loc. 285, 260 F.3d 16, 18 (1st Cir. 2001) (accepting the facts that the arbitrator found). And because this appeal follows cross-motions for summary judgment, we'll draw all reasonable inferences in favor of the respective non-movant. Ramos-Santiago v. United Parcel Serv., 524 F.3d 120, 122 (1st Cir. 2008).

### A. The Parties and the Terms of their Agreement

We start with the origins of the Union. After it successfully filed a petition with the National Labor Relations Board ("NLRB") to become the exclusive bargaining representative for graduate student workers at Harvard, the parties ratified a collective bargaining agreement (the "CBA") on November 27, 2021. The CBA, which was effective until June 30, 2025, included numerous stipulations between the parties. The articles most relevant to this appeal are:

- **Article 1 (the "Recognition Clause")** (agreeing that the bargaining unit includes (1) "all students" enrolled in degree programs and employed by Harvard and who provide instructional services "including graduate and undergraduate Teaching Fellows (teaching assistants, teaching fellows, course assistants)," (2) "all students enrolled in Harvard degree programs (other than undergraduate students at Harvard College) employed by Harvard University who serve as Research Assistants

(regardless of funding sources, including those compensated through Training Grants)," and (3) students employed by Harvard and enrolled in graduate schools including Harvard Business School, Harvard Law, and Harvard T.H. Chan School of Public Health, to name a few).

- **Article 2 (Titles & Classification)** (classifying a "Research Assistant 1" as a Harvard-enrolled graduate student worker conducting "research (including scientific rotations) under the supervision of faculty/principal investigator/museum curator").
- **Article 6 (Grievance and Arbitration)** (outlining the process by which a grievance under the agreement is resolved and arbitrated if necessary).
- **Article 20 (Compensation)** (explaining that a Research Assistant is "[a] graduate student usually appointed on an annual basis for a 12-month period to perform research work under the supervision of a faculty/principal investigator"; that "[t]he parties understand that the work of a Research Assistant is a blend of academic and employment endeavors and that clear separation of each is difficult"; and that "[t]he stipend that such an RA receives could be characterized as financial assistance or compensation or both").

- **Article 33 (Union Security)** (providing that individuals in the bargaining unit can opt in or out of the Union).

Under the terms of the CBA, Harvard was required to provide the Union with a weekly list of graduate student workers -- including "Research Assistant[s]" as defined by Articles 1 and 2 of the CBA -- that were in the bargaining unit. It also agreed to provide an "appointment letter" to each graduate student worker upon their hiring.[3] But that didn't happen for one graduate student worker. Though this PhD candidate was slotted to serve as a Research Assistant in the Psychology Department, he never received an appointment letter. And when the Union got wind of this omission, it filed a grievance with Harvard as required under Article 6 of the CBA. This grievance requested that Harvard provide the student with an appointment letter and add him to the list of Union-represented graduate student workers. Nearly three months later -- and with that grievance still unresolved -- the Union filed a second grievance with Harvard wherein it claimed that Harvard had in fact excluded all graduate student workers conducting research in the Psychology Department from its weekly bargaining unit lists and, consequently, deprived them of union

[3] An appointment letter inducts the student worker into the bargaining unit. It lists the faculty members or supervisors that the student worker will report to, location, schedule, and a statement that the student worker's position is covered by the CBA.

representation. In this second grievance, the Union requested that Harvard (1) include all omitted graduate student workers from the Psychology Department in the weekly bargaining unit lists, (2) pay the Union dues that would have been paid by the psychology doctoral students had they been properly included in the bargaining unit, and (3) notify in writing those that were omitted of their coverage under the CBA.

**B. Arbitration and the Ensuing Litigation**

In due course, the grievances were submitted for arbitration as prescribed by Article 6 of the CBA. The questions before the arbitrator were as follows:

(1) whether the grievance was substantively arbitrable;

(2) if yes, whether the grievance was timely filed and thus procedurally arbitrable;[4]

(3) whether Harvard violated the CBA by classifying the grievants (specifically, the psychology doctoral students) as non-Union graduate student workers thereby omitting them from the weekly bargaining unit list; and

[4] Harvard does not challenge the arbitrator's timeliness decision on appeal, so we consider it waived and will not address it. See, e.g., Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 87-88 (1st Cir. 2008).

(4) whether there is a remedy if Harvard violated the CBA.[5]

A series of four evidentiary hearings before the arbitrator occurred between July and October 2023. After those proceedings concluded, the arbitrator issued two consecutive decisions; the first addressed Harvard's timeliness challenge, while the second addressed the merits. Because it is the merits decision that animates Harvard's allegations of error, we'll focus our scrutiny on how the controversy got teed up below.

Before the arbitrator, the parties weaved diverging arguments as to whether the psychology doctoral students were "Research Assistant[s]" under the CBA. For its part, Harvard first insisted that the Union's grievance wasn't substantively arbitrable. Its central merits argument, in short, went like this. Because the psychology doctoral students received funding that was not tied to any employment responsibilities or service requirements to Harvard, they weren't, as a matter of law, definitionally "employees" under the National Labor Relations Act ("NLRA") as interpreted in Trustees of Columbia University in New York, 364 N.L.R.B. 1080, 1083 (2016). Any research undertaken by them -- even if done under the supervision of a Harvard faculty

[5] From the Union's perspective, only issues (3) and (4) were on the table. The arbitrator deemed issues (2) through (4) in need of resolution.

member -- was done purely for academic, not employment, purposes. And because these doctoral students were not statutory employees, they didn't qualify for membership in the bargaining unit, and as such, couldn't have their grievance resolved pursuant to the terms of the CBA of which they were not a part.

Not surprisingly, the Union was of another mind. It argued that the psychology doctoral students are "Research Assistant[s]" as defined by Articles 1 and/or 2 of the CBA (we'll get more into the specifics of those Articles momentarily) because they performed lab-based work under the supervision of a faculty member or a lab Principal Investigator.[6] Therefore, in accordance with the CBA, these graduate student workers properly belonged in the bargaining unit. The source of these students' compensation, which Harvard maintained should bar them from Article 1 and/or 2's definition of "Research Assistant[s]," should not impact their inclusion in the bargaining unit because the CBA explicitly permits students who receive "financial assistance or compensation or both" from any source to be members of the Union. Therefore, given Harvard's violation of the CBA, an appropriate remedy should be fashioned.

[6] Principal Investigators are tenured or tenured-track faculty members in the Psychology Department that run labs and conduct research.

Then came the arbitrator's decision (part one and part two). Deeming it irrelevant to the task at hand, she declined Harvard's insistence that she answer the precursor question of whether the psychology doctoral students were statutory "employees" as defined by the NLRB in Columbia. She disagreed with Harvard's position that declining to do so made the matter substantively inarbitrable. Rather, her role (as she put it) was to review the contract between the parties (the CBA) and, based upon her interpretation of the CBA's Article 1 "refined language relating to bargaining unit eligibility," determine whether Harvard violated it by excluding Research Assistants from the bargaining unit. In other words, as the arbitrator framed the issue, the question before her wasn't whether the bargaining unit would expand to include the psychology doctoral students; it was whether the students, extant, fit within the CBA's already-defined bargaining unit definition -- a critical distinction for our upcoming take on this kerfuffle.[7]

[7] To quote the arbitrator:

> The University's insistence that I must, necessarily, first determine whether psychology graduate students meet a common law employment standard, in effect, seeks to revisit and reexamine settled matters. The parties, through their negotiations and agreements, have agreed-upon language defining bargaining unit status. As a contract arbitrator, I will not revisit or disturb those agreements.

In answering that question, the arbitrator pointed out that the burden of persuasion rested with Harvard to demonstrate why the CBA should be interpreted to exclude a position from a particular bargaining unit. As to her analysis, the arbitrator observed that the plain language, the parties' history and past practices, and the CBA as a whole established that that the psychology doctoral students who conducted research, including grant-funded research, under the supervision of Harvard faculty or a lab Principal Investigator, qualified as "Research Assistant[s]" under Article 1 "and/or" Article 2 of the CBA. She also determined that the psychology graduate students were much like first-year Organismic and Evolutionary Biology ("OEB") graduate students who were previously found by the NLRB to be improperly omitted from the bargaining unit.[8]

The arbitrator noted that in one particular lab, two non-psychology doctoral students and two psychology doctoral students all received National Science Foundation grants, had the same responsibilities, and performed identical lab duties, yet the non-psychology doctoral students were in the bargaining unit while the psychology doctoral students were not. There was no

[8] In 2017 the NLRB found that the first-year OEB graduate students were assigned to and conducting scientific research in a lab that was equivalent to the work being done by the more senior OEB students already included in the bargaining unit, regardless of the source of the students' funding.

distinction between the research conducted by the non-psychology doctoral students and that of the psychology doctoral students that justified designating only the psychology doctoral students' research as purely academic (as Harvard contends). She further noted that the CBA "shows an express and deliberate rejection of an academic/employment binary."

Based on these factors, the arbitrator found that "the University violated the CBA by failing to classify psychology PhD students conducting research as Research Assistants under Article 1 and/or as Research Assistant 1 under Article 2." The arbitrator ordered Harvard to: (1) designate all of the psychology doctoral students performing lab-based research among the bargaining unit; (2) provide lost benefits and payments to the formerly omitted psychology doctoral students; and (3) process claims that had been submitted by those students.

Having lost in arbitration, Harvard sought the district court's intervention and asked it to vacate the arbitration award. Harvard argued -- among other things -- that the award should be vacated because (1) the grievance was filed on behalf of students not within the bargaining unit and therefore it was not substantively arbitrable, (2) the arbitrator didn't draw her decision from the essence of the CBA and exceeded her authority because (a) she ignored "clear contractual language" and (b) she had no power to include the psychology graduate student workers in

the bargaining unit, and (3) the award disrupted public policy because only employees (which Harvard contended the psychology doctoral students were not) were allowed to unionize and be included in the bargaining unit.

Responding to Harvard's complaint, the Union pushed back with a counterclaim of its own seeking confirmation of the award. It asseverated that the award was grounded in the terms of the CBA, the grievance was addressed through the mutually agreed upon process outlined in the CBA, and the arbitrator's remedy did not violate public policy. Therefore, it urged the court to confirm and implement the awards in their entirety, and grant the Union costs, attorneys' fees, expenses and other "just and proper" relief.

Eventually, the parties filed cross-motions for summary judgment, each seeking judgment as a matter of law on their respective claims. The district court denied Harvard's motion for summary judgment but granted the Union's[9], thereby confirming the arbitration award. Harvard appeals, and here is where we come in.

---

[9] The district court awarded the Union costs, but denied its request for attorney's fees because (quoting our precedent) it determined that Harvard's actions weren't "frivolous, unreasonable, or without foundation." Loc. 285, Serv. Emps. Int'l Union, AFL-CIO v. Nonotuck Res. Assocs., Inc., 64 F.3d 735, 737 (1st Cir. 1995) (quoting Wash. Hops. Ctr. v. Serv. Emp. Int'l Union, 746 F.2d 1503, 1510 (D.C. Cir. 1984)). The district court also denied the Union interest payments because the award accounted for lost benefits and payments and didn't explicitly include interest payments. The Union has not appealed that decision.

## II. Discussion

Much as it did below, Harvard advances here three primary arguments as to why the arbitrator's award should be vacated, and we'll walk through each in turn. We begin with our standard of review before tackling Harvard's claims and the Union's responses to them. A foreshadower's note: it doesn't end well for Harvard.

"We review the district court's decision to confirm or vacate an arbitration award de novo[.]" Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 932 F.3d 1, 7 (1st Cir. 2019). And in undertaking our review, we remain mindful that "[a]rbitral awards are nearly impervious to judicial oversight[,]" Teamsters Loc. Union No. 42 v. Supervalu, Inc., 212 F.3d 59, 61 (1st Cir. 2000), and that "[a] federal court's authority to defenestrate an arbitration award is extremely limited," Dialysis Access Ctr., LLC, 932 F.3d at 7 (quoting Mt. Valley Prop., Inc. v. Applied Risk Servs., Inc., 863 F.3d 90, 93 (1st Cir. 2017)). We'll say more about the ungenerous circumscription of our review once we delve into the analysis.

### A. Substantive Arbitrability

Raising first the issue of substantive arbitrability -- a concept examining whether a dispute involves subject matter the parties contractually agreed to arbitrate, Loc. 285, Serv. Emps. Int'l Union, AFL-CIO v. Nonotuck Res. Assocs., Inc., 64 F.3d 735, 739 (1st Cir. 1995) -- Harvard once again

contends that the issue of whether the psychology doctoral students were wrongly omitted from the bargaining unit was not substantively arbitrable.[10]

Referring to the students as "non-employees," Harvard contends that the students must have been first classified as "employees" under the NLRA's statuary definition before they could be included in the bargaining unit. As Harvard sees it, Trustees of Columbia University in New York, 364 N.L.R.B. 1080, 1083 (2016), dictates why that is so. For the psychology doctorial students to meet the statutory definition of employees they must have a common law employment relationship with Harvard -- that is they had to provide services to Harvard in exchange for compensation. See id. But, says Harvard, because they are "students who receive funds" for the sole purpose of "pursu[ing] their own academic goals," they are not employees. See id. at 1095. This type of status determination, and "whether [this] group of 'employees' constitutes a unit appropriate for collective bargaining," does not "depend upon contract interpretation but involve[s] the application of statutory policy, standards, and criteria" --

[10] Harvard applies this argument to other students that could potentially be considered "Research Assistant[s]" under the CBA, but because the original questions at arbitration centered around the psychology doctoral students' place in the bargaining unit and the award applies only to those students, we too will keep our focus on them.

crucial threshold matters for the NLRB, not an arbitrator. See Marion Power Shovel Co., 230 N.L.R.B. 576, 577-78 (1977).

In reaching a contrary conclusion, one that coincides with the Union's view, the district court reasoned that it was unclear whether Article 1 (the "Recognition Clause") was relying on the NLRA definition of "employees," and without a clear invocation of that statute, the arbitrator's determination that the definition was not controlling as to who was included in the bargaining unit was not an implausible interpretation of the CBA.

But that reasoning, says Harvard, is flawed. Pointing to the very first words of the Recognition Clause -- "As reflected in the National Labor Relations Board Case 01-RC-186442" -- Harvard says these words were an express callback to the specific NLRB representation process the parties had previously engaged in, meaning the clause was intended to cover only those employees already deemed appropriate by the NLRB for inclusion in the bargaining unit. Had the psychology students wished to be part of the unit, the Union "could [have] file[d] a petition to represent a group of individuals or it could [have] file[d] a unit clarification petition if it contend[ed] the group should be added to an existing bargaining unit." In Harvard's words: "The fundamental point is that the NLRB, not an arbitrator, decides questions under the Act, such as whether the students are employees and whether they can be added to the existing unit."

Not true, counters the Union. The arbitrator was not required to determine as a threshold matter whether the psychology doctoral students were statutory "employees" under the NLRA before proceeding to the merits. Rather, the dispute was substantively arbitrable because the NLRB process is not the exclusive means to determine whether an employee is represented by a union or included within the definition of a recognition clause. And the CBA reference to the NLRB's certification of the Union does not, as Harvard contends, move the needle. The Union argues that we ought to accept the district court's determination that this reference did not unambiguously compel the arbitrator to interpret the CBA as incorporating NLRA standards or definitions. Instead, resolving the parties' grievances was a classic example of contract interpretation, which only required the arbitrator to scrutinize the CBA, particularly Articles 1 and 2, and determine whether Harvard had violated them. And even if students who might otherwise be arguably excluded from the Act's definition of "employee" are, in fact, included in the bargaining unit, the NLRA does not legally preclude such membership, says the Union, if the parties voluntarily agreed to allow it and the CBA manifests such an intent.[11]

[11] It's worth noting that Harvard conceded during oral argument here that parties could voluntarily agree to include non-employees within a bargaining unit.

Here's our take. As earlier noted, "substantive arbitrability" refers to whether a dispute involves a subject matter the parties contractually agreed to arbitrate. Loc. 285, Serv. Emps. Int'l Union, AFL-CIO, 64 F.3d at 739. And while a party can't be forced to submit to arbitration any issue it hasn't agreed to so submit, a presumption of arbitrability arises if the parties agreed, in a CBA arbitration clause, to arbitrate the dispute. See id. at 738. If doubts arise on whether the arbitration covers a given issue, they "should be resolved in favor of coverage." Id. (quoting AT & T Techs, Inc. v. Commc'n Workers of Am., 475 U.S. 643, 650 (1986)).

Even with those principles in the backdrop, Harvard believes the parties put the cart before the horse by not first turning to the NLRB for a preliminary determination on the status of the PhD students within the bargaining unit. However, we don't see it as so. Harvard is right in that under the laws of this circuit, the scope of the bargaining unit is for the NLRB to decide. See Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO (Loc. 2201) v. Int'l Air Serv. of P.R., Inc., 636 F.2d 848, 849 (1st Cir. 1980); see also NLRB v. Me. Sugar Indus., Inc., 425 F.2d 942, 946 (1st Cir. 1970) (explaining that the NLRB enjoys "broad discretion" when determining the scope of a bargaining unit in an election to unionize). But that's not to be confused with who fits within the definition of an already-established, NLRB-

recognized unit. See Int'l Ass'n of Machinists, 636 F.2d at 849 ("While it is possible to construe the relief sought as calling for a determination of the scope of the bargaining unit represented, a task committed exclusively to the [NLRB], labor policy supplies a preference for interpreting questions as arbitrable in such a situation.")

On behalf of the psychology doctoral students, the Union filed the underlying grievance seeking an interpretation of Articles 1 and 2 of the CBA (relating to who is within the bargaining unit). It did so citing to Article 6 of the CBA, wherein the parties agreed that any student worker, a group of student workers, or the Union could file a grievance regarding "the interpretation, the application, or claimed violation(s) of a specific provision(s)" of the CBA, with said grievance to be resolved by an arbitrator. See UMass Mem'l Med. Ctr., Inc. v. United Food & Com. Workers Union, 527 F.3d 1, 4 (1st Cir. 2008) (finding that an issue was arbitrable "because the parties had contracted for the decision of an arbitrator, not a judge"). Once the parties were before the arbitrator, she necessarily had to review the CBA to interpret the bargaining unit parameters. See United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 37-38 (1987) ("Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the

contract that they have agreed to accept."); see also Int'l Ass'n of Machinists, 636 F.2d at 849 (applying our "preference for interpreting questions as arbitrable" to "the question of whether or not the employees in question came within the definition of the bargaining unit"). Furthermore, the arbitrator confined her focus to the issue of whether Harvard violated the CBA, not -- as Harvard contends -- whether to expand the scope of the bargaining unit. Thus, after concluding she needn't answer whether the students were "employees," specifically common law employees, under the NLRA, she put her focus on legal contract interpretation. The arbitrator was therefore acting with the force of the CBA's Grievance Clause behind her to address an interpretation grievance -- a responsibility typically reserved for an arbitrator and entitled great deference by the courts. See Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 324 (1st Cir. 2016) (emphasizing "the primacy of the arbitrator in CBA interpretation"); see also Bos. Med. Ctr., 260 F.3d at 21 (explaining that the courts give "great deference" to an arbitrator's interpretation of a matter that the parties to a CBA have agreed to arbitrate).

A reading of Columbia does not help Harvard's arguments here, either. Trs. of Columbia Univ., 364 N.L.R.B. at 1083. In short, the NLRB found there, as Harvard argues, that graduate student workers completing work in exchange for compensation by

the university met the common-law test for employment and should've been included in the bargaining unit. Id. at 1082-83. Given this finding, it sent the case back to the Regional Director for union certification. Id. at 1083, 1101. But this case is different. The parties had already agreed in the CBA that "Research Assistant[s]," as therein defined, may be included in the bargaining unit, despite receiving third-party funding. Specifically, the parties acknowledged in Article 20 of the CBA the difficulty in separating the research conducted by a "Research Assistant" in their capacity as employees in the bargaining unit from the research conducted in their capacity as students fulfilling an academic requirement. Moreover, the Union's bargaining unit included graduate student workers other than the psychology doctoral students that conducted their first- and second-year research under the same academic requirement rubric as the psychology doctoral students (i.e. their own research under the supervision of a Harvard faculty member with third-party funding).[12]

So here, we reject Harvard's substantive arbitrability argument and proceed.

[12] These students include the OEB doctoral students we previously mentioned.

**B. The Essence of the CBA**

Making an argument similar to the last, Harvard next contends that the award should be vacated because the arbitrator ignored the plain language of the CBA. It first brings our attention to Article 1 of the CBA, which requires "Research Assistant[s]" to be "employed by" Harvard. Harvard claims that this language dictates a requirement that those within the bargaining unit be "employed by" it, "[r]egardless of whether this is a reference to a statutory requirement under the NLRA, an independent contractual requirement, or both . . . ." Instead of properly understanding the language in this fashion, the arbitrator (Harvard contends) impermissibly extended the CBA to the psychology doctoral students through Article 2's Titles and Classification provision defining a "Research Assistant," which she supposedly couldn't do without first determining whether the students were "employed by" Harvard as required under Article 1.

Along similar lines, Harvard argues that the arbitrator ignored provisions of the CBA that excluded academic endeavors when she considered Harvard's treatment of other students. By nevertheless concluding that these psychology doctoral students could be in the bargaining unit, Harvard claims that the arbitrator improperly "dispensed her own brand of industrial justice." Furthermore, taking aim at the district court's interpretation of the award, Harvard says the court erred first in giving credence

to the arbitrator's reliance on past practices despite her failure to plainly state she was doing so, and further erred by impermissibly making additional findings of fact in the Union's favor that the arbitrator never made.

To all of this, the Union counters that the arbitrator's award draws its essence from the CBA because she properly interpreted the plain language of Articles 1 and 2 in the context of the entire CBA, the bargaining history of the parties, and past practices. For instance, the Union observes that the arbitrator considered Article 20 of the CBA (which expressly highlighted the difficulty in differentiating between work that was done for academic and employment purposes) in reaching her conclusion. Likewise, the Union argues that the arbitrator merely applied "a judicially-encouraged approach of common sense to recognize the norm under the CBA" when she compared similarly situated graduate students included in the CBA to the psychology doctoral students.

Building on our earlier point that an arbitrator's award is rarely set aside, see Bos. Med. Ctr., 260 F.3d at 21, we add that "a party who seeks judicial review [of an arbitrator's award] ordinarily must demonstrate that the award is contrary to the plain language of the CBA and that the arbitrator, heedless of the contract language, preferred instead to write [her] own prescription for industrial justice." Teamsters Loc. Union No. 42, 212 F.3d at 65. A successful challenge to an arbitration award

requires a showing "that the award is (1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact." Id. at 66 (cleaned up). And we have repeatedly made clear in the arbitration realm: so long as the arbitrator presents any plausible basis for their interpretation of a CBA, we have no business invalidating that interpretation. Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Loc. No. 379, 29 F.3d 742, 745 (1st Cir. 1994).

Tackling Harvard's second argument first, one that essentially amounts to an accusation that the district court put words in the arbitrator's mouth, we note that the arbitrator wasn't required to provide comprehensive reasoning for her award. See id. at 747. And so we keep our discussion here succinct.

It is evident that the arbitrator didn't solely rely on Article 2. Specifically, she premised her decision on the testimony of graduate student workers and Harvard faculty, the relevant provisions of the CBA -- which she went through with a fine-tooth comb -- and past practices. In the same fashion, the arbitrator applied the specific facts as they pertain to the psychology doctoral students against the "context of the entire contract." To the extent that Harvard argues that the arbitrator

didn't expressly state that she relied on past practices in reaching her decision, we note once more that the arbitrator wasn't required to provide the kind of comprehensive reasoning for her award that Harvard urges. See id.

Harvard also fails to show where in all of this the arbitrator's interpretation of the CBA fails to pass muster under a Teamsters Local Union analysis (because the interpretation somehow lacks facts and reason), or to show how a judge could not conceivably reach the same conclusion as the arbitrator, or to show that the award is based on a crucial assumption unsupported by the facts. See 212 F.3d at 66–67. Where the arbitrator so clearly leans on testimony, contractual language, and past practices in reaching a plausible interpretation of the CBA, "[a] reviewing court can go no further." Id. at 67; see Lab. Rels. Div. of Constr. Indus. of Mass., 29 F.3d at 747 (holding that once an arbitrator provides their reasoning for an award, that award cannot be vacated unless the reasoning "strongly impl[ies] that the arbitrator may have exceeded" her authority); El Dorado Tech. Servs., Inc. v. Union General de Trabajadores de P.R., 961 F.2d 317, 319 (1st Cir. 1992) ("[A] court should uphold an award that depends on an arbitrator's interpretation of a collective bargaining agreement if it can find, within the four corners of the agreement, any plausible basis for that interpretation."); Dorado Beach Hotel Corp. v. Union de Trabajadores de la Industria

Gastronomica de P.R., 959 F.2d 2, 4 (1st Cir. 1992); Bacardi Corp. v. Congreso de Uniones Industriales de P.R., 692 F.2d 210, 211 (1st Cir. 1982). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Misco, 484 U.S. at 38.

So again, Harvard fails to persuade.

### C. Public Policy

Harvard's last argument for vindication is that the award violates the "dominant and well-established public policy" in favor of protecting workers' rights to determine whether they want union representation. Harvard's specific concern here is that the award forced all the psychology doctoral students -- who have never been categorized as "employees" by the NLRB under the NLRA -- into the bargaining unit without the option to opt out. Public policy would be better served, says Harvard, if the Union had instead filed a petition with the NLRB for it to determine whether the psychology doctoral students belonged in the existing bargaining unit rather than having the arbitrator "backdoor" them in (or so Harvard says).

The Union counters that the award doesn't contravene public policy because the NLRA doesn't preclude individuals who don't fit within the statutory definition of "employees" from being

represented by a union, included in a bargaining unit, or being subject to a CBA. It adds that union representation is based on majority rule without a federal requirement that individual employees have the right to vote on union representation, especially after the union is certified as the exclusive bargaining representative. The Union lastly claims that the award shouldn't be set aside because it's not "clearly repugnant" to the NLRA or "palpably wrong" so as to violate NLRB precedent.

We've recognized an exception to "the general rule that the arbitrator has the last word" -- namely, the narrow public policy expectation, which allows courts to vacate an arbitrator's decision if the award violates "an 'explicit . . . well defined and dominant' public policy, as ascertained 'by reference to . . . laws and legal precedents.'" Mercy Hosp., Inc. v. Mass. Nurses Ass'n, 429 F.3d 338, 343-44 (1st Cir. 2005) (citing W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers, 461 U.S. 757, 766 (1983)). It is not enough that an award may be supposedly violative of some public policy notion. Id. Rather, the public policy purportedly violated must be ascertained by references to laws and legal precedents. E. Ass'd Coal Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 62 (2000).

That is presumably why Harvard cites to the NLRA in support of its claim that the award violates public policy. And though Harvard is correct that the NLRA generally protects workers'

rights to unionize, see 29 U.S.C. § 157, we do not agree that the psychology doctoral students' right to do so is infringed upon by the arbitrator's award.

It has long been recognized by the Supreme Court and this circuit that the NLRA protects workers' freedom of association, NLRB v. J. Weingarten, Inc., 420 U.S. 251, 261-62 (1975), "right to . . . engage in concerted activities for mutual aid and protection," Tamburello v. Comm-Tract Corp., 67 F.3d 973, 979 (1st Cir. 1995), and to participate in collective bargaining, Epic Sys. Corp. v. Lewis, 584 U.S. 497, 521 (2018).

Pivoting off Harvard's own premise, we conclude that in line with the NLRA's purpose, the psychology doctoral students in fact had the right to exercise their freedom of association and determine whether they wanted to be in the Union. They were specifically afforded that right through the CBA itself once the arbitrator's award placed this category of workers in the bargaining unit. Particularly, Article 33 of the CBA explicitly states that graduate students within the bargaining unit "are free to decide whether or not they wish to join the Union and pay membership dues and fees." It further states that every student worker "will be given the choice to affirm choosing to join the Union or not for each appointment period, or if already a member, if they wish to opt out." The CBA adds that "[t]here will be no fee or further consequences" should a student worker not join the

Union. So we echo the district court here in concluding that the award only declares that the psychology doctoral students belong in the already-established bargaining unit, giving them an opportunity to decide whether they want to belong to the Union, without infringing on their associational rights. Vacating the award would deprive these students of that opportunity to opt in or out -- which Harvard concedes they should have.

Harvard does not clearly show that the award creates an explicit conflict with other laws or legal precedent beyond its general assertions regarding the NLRA, and that alone isn't enough for us to endorse vacatur of the award. See Prudential-Bache Sec., Inc. v. Tanner, 72 F.3d 234, 241-42 (1st Cir. 1995) (finding that a party's argument that an arbitration award violates public policy fails when it can't clearly show a specific conflict with laws or legal precedent). Seeing that the award does not frustrate the NLRA and finding no other explicit, well defined public policy against the award, we end our discussion here. See New England Health Care Emps. Union, Dist. 1199, SEIU, AFL-CIO v. R.I. L. Servs., 273 F.3d 425, 427-28 (1st Cir. 2001).

Again, Harvard cannot prevail.

## III. Conclusion

Because we discern no reason for the award not to stand, we decline to vacate the award and **affirm** the district court's decision. Costs to appellee.